## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**LEGENDS TITLE, LLC, et al.,**

      *Plaintiffs*,

      **v.**

**CAPITAL ONE,**
**NATIONAL ASSOCIATION.,** *et al.,*

      *Defendants*.

      **Case No. 1:22-cv-00650-JRR**

\* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OPINION

This matter comes before the court on Defendant Capital One, National Association's ("Capital One") Renewed Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 31; the "Motion"). The parties' submissions have been reviewed and no hearing is necessary. Local Rule 105.6 (D. Md. 2021). For the reasons that follow, by accompanying order, the Motion will be granted.

### BACKGROUND[1]

Plaintiff Legends Title, LLC ("Legends") is a Utah limited liability company and Plaintiff Lori Gagnon is the sole member of Legends (collectively "Plaintiffs"). (ECF No. 28, p. 2 ¶¶ 1-2.) Gagnon is a citizen of Utah. *Id.* ¶ 2. Capital One, is a federally chartered bank organized under U.S. laws with its main office in Virginia. *Id.* p. 3 ¶ 3. Defendant Darrel Mark Thomas is a citizen of California. *Id.* ¶ 4. Defendant Vanfica 07 Inc. ("Vanfica") is incorporated under Florida law with no known operations in the United States. *Id.* ¶ 4-5.

---

[1] For purposes of this memorandum, the court accepts as true the well-pled facts set forth in the First Amended Complaint.

Plaintiffs allege that Thomas and Vanfica, by way of a phishing scheme, defrauded them into wiring $333,734.98 into an account held by Thomas at Capital One.  The Amended Complaint contains seven counts: Intentional Misrepresentation against Thomas (Count 1); Intentional Misrepresentation against Vanfica (Count 2); Civil Conspiracy against Thomas and Vanfica (Count 3); Unjust Enrichment against Thomas (Count 4); Unjust Enrichment against Vanfica (Count 5); Aiding and Abetting against Capital One (Count 6); and Unjust Enrichment against Capital One (Count 7).  (ECF No. 28.)

Capital One moves to dismiss the Amended Complaint for lack of personal jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(2) or, in the alternative, for failure to state a claim pursuant to Rule 12(b)(6).  (ECF No. 31-1, p. 2.)

**LEGAL STANDARDS**

### _Federal Rule of Civil Procedure 12(b)(2)_

"When a court's power to exercise personal jurisdiction over a nonresident defendant is challenged by a motion under Federal Rule of Civil Procedure 12(b)(2), 'the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence.'" _CoStar Realty Info., Inc. v. Meissner,_ 604 F. Supp. 2d 757, 763 (D. Md. 2009) (quoting _Carefirst of Maryland, Inc. v. Carefirst Pregnancy Ctrs., Inc.,_ 334 F.3d 390, 396 (4th Cir. 2003)) (citations omitted).  "If jurisdiction turns on disputed facts, the court may resolve the challenge after a separate evidentiary hearing or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question." 604 F. Supp. 2d at 763 (citing _Combs v. Bakker_, 886 F.2d 673, 676 (4th Cir. 1989)).  "If the court chooses to rule without conducting an evidentiary hearing, relying solely on the basis of the complaint, affidavits and discovery materials, 'the plaintiff need only make _prima facie_ showing of personal jurisdiction.'" _Id._ (quoting _Carefirst_, 334 F.3d at 396) (citations omitted).  "In determining

2

whether the plaintiff has proven a *prima facie* case of personal jurisdiction the court 'must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor.'" *Id.* (citing *Mylan Labs., Inc. v. Akzo, N.V.,* 2 F.3d 56, 60 (4th Cir. 1993)) (citations omitted).

### *Federal Rule of Civil Procedure 12(b)(6)*

A motion asserted under Rule 12(b)(6) "tests the legal sufficiency of a complaint." It does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville,* 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999)). Accordingly, a "Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards*, 178 F.3d at 244 (citing *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)). The court, however, is "not required to accept as true the legal conclusions set forth in a plaintiff's complaint." *Id.* (citing *District 26, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.,* 609 F.2d 1083, 1085 (4th Cir. 1979)).

## ANALYSIS

## I.     PERSONAL JURISDICTION – 12(b)(2)

"The requirement that the court have personal jurisdiction . . . springs not from Article III of the Constitution, but from the Due Process Clause." *Fidrych v. Marriott Int'l, Inc.,* 952 F.3d 124, 131 (4th Cir. 2019) (citing *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 (1982)). "Because the personal jurisdiction requirement 'recognizes and protects an individual liberty interest, . . . the requirement may be waived by a defendant's 'express or implied consent to the personal jurisdiction of the court.'" *Id.* (citing *Ins. Corp. of Ireland,* 456

U.S. at 703.)   "Absent consent, the exercise of personal jurisdiction must comport with the requirements of the Due Process Clause: valid service of process, as well as . . . minimum contacts with the forum so that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice."  *Id.* (quoting *Hawkins v. i-TV Digitális Távközlési zrt.*, 935 F.3d 211, 228 (4th Cir. 2019)) (citations omitted).   The nature and quantity of forum-state contacts required depends on whether the case involves the exercise of "specific" or "general" jurisdiction.  *Id.*

"A court may assert general jurisdiction over foreign corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State."  *Goodyear Dunlop Tires Operations, S.A., v. Brown,* 564 U.S. 915, 919 (2011) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)).  Specific jurisdiction depends on an "'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."  *Id.* (quoting von Mehren & Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 HARV. L. REV. 1121, 1136 (1966)).  Plaintiffs do not contend the court has specific jurisdiction over Capital One; rather, they proceed on grounds of general jurisdiction.   (ECF No.33, p. 4.)   And Defendant's challenge pertains to general jurisdiction.

A.      **Section 6-103(b)(4) of the Maryland Long Arm Statute and Due Process**

Under Federal Rule of Civil Procedure 4(k)(1)(A), a federal court may exercise personal jurisdiction over a defendant in the manner provided by state law.  *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 622 (4th Cir. 1997).  The parties agree that Capital One is a non-resident defendant corporation.  In order for the court to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized

under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment. *Christian Sci. Bd. Of Dirs. Of the First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). This court accepts as binding Maryland courts' interpretation with regard to the state's long-arm statute. *Mylan Labs.*, *Inc. v. Akzo, N.V.,* 2 F.3d 56, 61 (4th Cir. 1993). It is well settled in Maryland that the state's long-arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Constitution. *Mohamed v. Michael*, 279 Md. 653 (1977). Thus, this court's statutory and constitutional inquiry is merged for purposes of establishing personal jurisdiction. *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135 (4th Cir. 1996).

Maryland's Long-Arm Statute provides:

> (**a**) If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.
> (**b**) A court may exercise personal jurisdiction over a person, who directly or by an agent:
>> (**1**) Transacts any business or performs any character of work or service in the State;
>> (**2**) Contracts to supply goods, food, services, or manufactured products in the State;
>> (**3**) Causes tortious injury in the State by an act or omission in the State;
>> (**4**) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;
>> (**5**) Has an interest in, uses, or possesses real property in the State; or
>> (**6**) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

MD. CTS. & JUD. PROC. §§ 6-103(a) and (b).

5

Maryland's long-arm statute requires Plaintiffs to identify the section of the long-arm statute on which they rely.  MD. CODE ANN., CTS. & JUD. PROC. § 6-103(a); *Ottenheimer Publishers, Inc. v. Playmore, Inc.*, 158 F. Supp. 2d 649, 652 (D. Md. 2001) ("[i]t is nonetheless necessary first to identify a specific Maryland statutory provision authorizing jurisdiction …").  This requirement can be met through a complaint or in opposition to a 12(b)(2) motion.  *Hausfeld v. Love Funding Corp.*, 16 F. Supp. 3d 591, 597 (D. Md. 2014).  As referenced above, Plaintiffs assert the court may exercise general personal jurisdiction over Capital One pursuant to MD. CODE ANN. CTS. & JUD. PROC. § 6-103(b)(4).   (ECF No. 33, p. 4.)

"In cases where personal jurisdiction is alleged under subsection (b)(4), the requirement of subsection (a) has been eliminated."  *Silbert v. Flint,* 564 F. Supp. 1524, 1528 (D. Md. 1983).  General personal jurisdiction under subsection (b)(4) of the long-arm statute may be exercised where a defendant's contacts with Maryland are such that requiring them to defend a suit here would not offend the notions of fair play and substantial justice.  *Johnson v. Helicopter & Airplane Services Corp.*, 389 F. Supp. 2d 509, 521 (D. Md. 1974).  "It is not necessary that the doing or soliciting of business, the engagement in another persistent course of conduct, or the derivation of substantial revenue have any relationship to the alleged acts giving rise to the suit."  *Id.* (citing *Topik v. Catalyst Research Corp.*, 339 F. Supp. 1102, 1106 (D.Md. 1972)) (citations omitted).  "When a tortious injury is alleged to have occurred outside the state, as it has been alleged here, it is only necessary that the defendant (1) 'regularly does or solicits business,' or (2) 'engages in other persistent course of conduct,' or (3) 'derives substantial revenue from goods or services . . . used or consumed' in Maryland."  *Id.* (citations omitted).

Plaintiffs argue that Section 6-103(b)(4) is satisfied because Capital One regularly solicits business and engages in a persistent course of conduct within the state, employs Maryland

residents, derives substantial revenue from services provided in Maryland, and caused tortious injury outside of Maryland by an act or omission outside the state.  (ECF No. 33, pp. 5-6.) Plaintiffs further assert that Capital One purposely availed itself of the protections afforded by Maryland law by conducting substantial business in Maryland, registering to do business in Maryland, and having branches and offices in Maryland.  Plaintiffs urge that "Capital One's considerable ties to, and business dealings in, Maryland create the minimum contacts necessary to ensure the maintenance of a suit against Defendant in Maryland does not offend traditional notions of fair play and substantial justice."  *Id.*

The Amended Complaint alleges:

> Defendant Capital One, National Association is a domestic corporation that is registered to do business in Maryland, has branches and offices in Maryland, employs Maryland residents, and regularly does significant business in the State of Maryland. Defendant's principal place of business is McLean, Virginia.

> Plaintiff Legends Title is an accountholder of Defendant Capital One with a "Spark Business" Visa credit card.

(ECF No. 28 ¶¶ 1, 11.)

Capital One counters that "in-state business … does not suffice to permit the assertion of general jurisdiction."  (ECF No. 36, p. 2) (quoting *BNSF Ry. Co., v. Tyrrell,* 137 S. Ct. 1549, 1559 (2017)).  Capital One argues further that cases from the 1970s and 1980s that hold that a corporation's in-state business activity is enough to establish general personal jurisdiction were abrogated by *Daimler AG v. Bauman,* 571 U.S. 117 (2014) and its progeny.  (ECF No. 36, p. 3, n.1.)

In determining whether Capital One has sufficient contact with Maryland such that the exercise of personal jurisdiction over it would not offend due process, the court finds *Goodyear*, *Perkins, Daimler*, and *BNSF,* instructive.[2]

In *Goodyear Dunlop Tires Operations, S.A. v. Brown,* three international subsidiaries were sued in North Carolina state court for an accident that occurred in France. The subsidiaries asserted that North Carolina lacked personal jurisdiction over them. 564 U.S. 915, 918 (2011). The Supreme Court addressed whether a foreign subsidiary with a U.S. parent corporation is amenable to suit in state court on claims unrelated to the subsidiaries' activity in the state. *Id.*

The Court observed that prior to *Goodyear,* the Court had only considered whether an out-of-state corporate defendant's in-state contacts were "continuous and systematic" on two occasions:

> In only two decisions postdating *International Shoe*, … has this Court considered whether an out-of-state corporate defendant's in-state contacts were sufficiently "continuous and systematic" to justify the exercise of general jurisdiction over claims unrelated to those contacts: *Perkins v. Benguet Consol. Mining Co*., 342 U.S. 437, 72 S. Ct. 413, 96 L. Ed. 485, 63 Ohio Law Abs. 146 (1952) (general jurisdiction appropriately exercised over Philippine corporation sued in Ohio, where the company's affairs were overseen during World War II); and *Helicopteros*, 466 U.S. 408, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (helicopter owned by Colombian corporation crashed in Peru; survivors of U. S. citizens who died in the crash, the Court held, could not maintain wrongful-death actions against the Colombian corporation in Texas, for the corporation's helicopter purchases and purchase-linked activity in Texas were insufficient to subject it to Texas court's general jurisdiction).

*Goodyear,* 564 U.S. at 925.

---

[2] *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915 (2011); *Daimler AG v. Bauman,* U.S. 571 U.S. 117 (2014); *Perkins v. Benguet Consol. Mining Co*., 342 U.S. 437 (1952); *BNSF Ry. Co., v. Tyrrell,* 137 S. Ct. 1549 (2017).

The North Carolina state court determined that it could exercise general personal jurisdiction over the three international subsidiaries because the subsidiaries deliberately placed their product in the stream of commerce within the state. *Id.* at 926. The Supreme Court disagreed holding: "[a] connection so limited between the forum and the foreign corporation . . . is an inadequate basis for the exercise of general jurisdiction. Such a connection does not establish the 'continuous and systematic' affiliation necessary to empower North Carolina courts to entertain claims unrelated to the foreign corporation's contacts with the State." *Id.* at 920.

In reaching its holding, the *Goodyear* Court noted:

> In contrast to the parent company, Goodyear USA, which does not contest the North Carolina courts' personal jurisdiction over it, petitioners are not registered to do business in North Carolina. They have no place of business, employees, or bank accounts in North Carolina. They do not design, manufacture, or advertise their products in North Carolina. And they do not solicit business in North Carolina or themselves sell or ship tires to North Carolina customers.

*Id.* at 921.

In 2014, three years after its decision in *Goodyear,* the Supreme Court, in *Daimler AG v. Bauman,* addressed whether a United States court could assert personal jurisdiction over a foreign defendant for acts occurring entirely outside of the U.S. 571 U.S. 117, 120 (2014). In *Daimler,* 22 Argentinian residents sued DiamlerChrysler Aktiengesellschaft ("Daimler") in the United States District Court for the Northern District of California. The complaint alleged that, during Argentina's 1976-1983 "Dirty War," a Daimler subsidiary collaborated with government security forces to kidnap, detain, torture, and kill certain workers, including plaintiffs and persons closely related to plaintiffs. *Id.* Jurisdiction was predicated on the contacts of a Daimler subsidiary incorporated in Delaware with its principal place of business in New Jersey. *Id.* The Court addressed whether the Due Process Clause of the Fourteenth Amendment allowed the district court

to exercise general jurisdiction over Daimler despite there being no connection between California and the alleged atrocities. *Id*. at 121.

The *Daimler* Court noted:

> Our post-*International Shoe* opinions on general jurisdiction, by comparison, are few. "[The Court's] 1952 decision in *Perkins v. Benguet Consol. Mining Co*. remains the textbook case of general jurisdiction appropriately exercised over a foreign corporation that has not consented to suit in the forum."

571 U.S. at 129 (quoting *Goodyear*, 564 U. S. at 927-28).

In *Perkins,* the plaintiff, a nonresident of Ohio, sued the defendant nonresident corporation in Ohio state court. 342 U.S. 437, 438 (1952). The *Perkins* Court considered whether "as a matter of federal due process, the business done in Ohio by the respondent mining company was sufficiently substantial and of such a nature as to permit Ohio to entertain a cause of action against a foreign corporation, where the cause of action arose from activities entirely distinct from its activities in Ohio." *Id.* at 447.

The *Perkins* Court reasoned and held:

> The company's mining properties were in the Philippine Islands. Its operations there were completely halted during the occupation of the Islands by the Japanese. During that interim the president, who was also the general manager and principal stockholder of the company, returned to his home in Clermont County, Ohio. There he maintained an office in which he conducted his personal affairs and did many things on behalf of the company. He kept there office files of the company. He carried on there correspondence relating to the business of the company and to its employees. He drew and distributed there salary checks on behalf of the company, both in his own favor as president and in favor of two company secretaries who worked there with him. He used and maintained in Clermont County, Ohio, two active bank accounts carrying substantial balances of company funds. A bank in Hamilton County, Ohio, acted as transfer agent for the stock of the company. Several directors' meetings were held at his office or home in Clermont County. From that office he supervised policies dealing with the rehabilitation of the corporation's properties in the Philippines and

he dispatched funds to cover purchases of machinery for such rehabilitation. Thus he carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company. He there discharged his duties as president and general manager, both during the occupation of the company's properties by the Japanese and immediately thereafter. While no mining properties in Ohio were owned or operated by the company, many of its wartime activities were directed from Ohio and were being given the personal attention of its president in that State at the time he was served with summons. . . . Without reaching that issue of state policy, we conclude that, under the circumstances above recited, it would not violate federal due process for Ohio either to take or decline jurisdiction of the corporation in this proceeding.

*Id.* at 447-48.

In *Daimler,* the Court rejected the plaintiffs' proposal that the Court sanction the exercise of general jurisdiction in every state in which a corporation engages in a "substantial, continuous, and systematic course of business," holding that doing so would be "unacceptably grasping." 571 U.S. at 137-38.   In so holding, the Court further clarified the meaning of "continuous and systematic" as employed in *International Shoe*:

[T]he words "continuous and systematic" were used in I*nternational Shoe* to describe instances in which the exercise of specific jurisdiction would be appropriate.   . . .   Turning to all-purpose jurisdiction, in contrast, *International Shoe* speaks of "instances in which the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit . . . *on causes of action arising from dealings entirely distinct from those activities.*"   . . .   Accordingly, the inquiry under *Goodyear* is not whether a foreign corporation's in-forum contacts can be said to be in some sense "continuous and systematic," it is whether that corporation's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State."

*Daimler,* 571 U.S. at 138-39 (citations omitted).

Turning back to the question of whether the California district court could assert general personal jurisdiction over the Daimler subsidiaries, the Court held:

Here, neither Daimler nor [its subsidiary] is incorporated in California, nor does either entity have its principal place of business

> there. If Daimler's California activities sufficed to allow
> adjudication of this Argentina-rooted case in California, the same
> global reach would presumably be available in every other State in
> which [the subsidiary's] sales are sizable. Such exorbitant exercises
> of all-purpose jurisdiction would scarcely permit out-of-state
> defendants "to structure their primary conduct with some minimum
> assurance as to where that conduct will and will not render them
> liable to suit."

*Id.* (quoting *Burger King Corp., v. Rudzewicz*, 471 U. S. 462, 472, (1985)) (internal quotation marks omitted).

In *BSNF*, a railroad company was sued in Montana despite not being headquartered or maintaining its principal place of business there. The *BNSF* Court found that the railroad company was not so "heavily engaged in activity in Montana 'as to render [it] essentially at home.'" *BSNF,* 137 S. Ct. at 1559. The Court reasoned and held:

> As earlier noted, [the railroad company] has over 2,000 miles of
> railroad track and more than 2,000 employees in Montana. But, as
> we observed in *Daimler*, "the general jurisdiction inquiry does not
> focus solely on the magnitude of the defendant's in-state contacts."
> *Id.* at 139, n.20 (internal quotation marks and alterations omitted).
> Rather, the inquiry "calls for an appraisal of a corporation's
> activities in their entirety"; "[a] corporation that operates in many
> places can scarcely be deemed at home in all of them." *Id.*, at 140,
> n.20. In short, the business [the railroad company] does in Montana
> is sufficient to subject the railroad to specific personal jurisdiction
> in that State on claims related to the business it does in Montana.
> But in-state business, we clarified in *Daimler* and *Goodyear*, does
> not suffice to permit the assertion of general jurisdiction over claims
> like [the plaintiffs'] that are unrelated to any activity occurring in
> Montana.

*BNSF,* 137 S. Ct. at 1559.

Because the court is deciding the issue of personal jurisdiction without conducting an evidentiary hearing, the court's consideration of facts is limited to the Complaint and affidavits, if any. *CoStar Realty Info., Inc. v. Meissner,* 604 F. Supp. 2d 757, 764 (D. Md. 2009). Here, the facts regarding Capital One's contacts with the state of Maryland are insufficient to overcome the

guardrails for exercising general personal jurisdiction as set forth in *Goodyear, Daimler, Perkins* and *BNSF.* In *Diamler* and *BNSF,* although the defendants had engaged in some business within the state, their engagements were not systematic and persistent such as to render the defendants at home.

In *Daimler,* the contacts Daimler had with the state of California were limited to a subsidiary selling cars in the state. On this thin a foundation, the Court declined to create an all-purpose jurisdiction rule. 571 U.S. 117, 138-39 (2014), *supra.* Importantly, Daimler conducted business nationally and internationally, which meant that if the Court found that Daimler's limited contacts with California subjected it to all-purpose jurisdiction there, then Daimler would be subjected to all-purpose jurisdiction in every state where a subsidiary had sizeable sales. *Id.* Instead, the Court cautioned against such "exorbitant" exercise of all-purpose jurisdiction. *Id.*

In *BNSF*, the defendant railroad company had railroad tracks that ran through several states of which Montana was only one. The Court assessed the railroad's business activity in its entirety and found that, while the railroad's contacts with Montana were sufficient for specific jurisdiction, exercising general jurisdiction would run afoul of its holdings in *Goodyear* and *Daimler.* 137 S. Ct. 1549, 1559 (2017), *supra.* Conversely, in *Perkins,* the defendant company had mining properties in the Philippine Islands but ceased operations there during wartime. 342 U.S. at 447. The Court found that, although there were no mining operations in Ohio, the president of the company conducted "continuous and systematic" wartime related business in Ohio. *Id.* at 448 Therefore, Ohio could take or decline general jurisdiction over the defendant company. *Id.*

Here, Capital One is headquartered in Virginia; Plaintiffs are residents of Utah; and the alleged tortious activity occurred outside of Maryland. Although Capital One maintains branches, generates substantial revenue from its in-state services, and employs Maryland residents, it also

operates branches in at least seven other states.  Further, it generates revenue and conducts business nationally through ATMs and internet services.  If the court were to accept Plaintiffs' position that Capital One's operation of branches in Maryland is sufficient to confer general personal jurisdiction, that would mean that Capital One would be "at home" in at least seven states, which is precisely the expansive result against which *Daimler* and *Goodyear* cautioned[3]  "*Goodyear*

---

[3] Although the Supreme Court in *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006), addressed diversity subject matter jurisdiction, the Court's analysis and reasoning further bolster this court's holding that Capital One is not "at home" in Maryland on the basis that it operates branches in the state.

     In *Wachovia*, Wachovia Bank, National Association ("Wachovia"), like Capital One, was a national banking association.  Wachovia's designated main office was in Charlotte, North Carolina.  Like Capital One, it operated branches in other states.  In the underlying litigation, the plaintiffs – citizens of the South Carolina – sued Wachovia in South Carolina state courts.  Wachovia filed a petition to compel arbitration in the United States District Court for the District of South Carolina asserting jurisdiction on the basis of diversity of citizenship under 28 U.S.C. § 1332. *Id.* at 308.   The district court denied Wachovia's petition on the merits and did not address federal subject matter jurisdiction.  *Id*.  The case was appealed to the United States Court of Appeals for the Fourth Circuit.  The Fourth Circuit majority found that Wachovia's citizenship for diversity purposes was controlled by 28 U.S.C. § 1348, which provides in pertinent part, "[a]ll national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located."   Based on the majority's reading of the statute, it found that Wachovia was a "citizen" of every state where it maintained an office.  Therefore, Wachovia was a citizen of South Carolina and could not bring the suit in the South Carolina federal court.  *Id*.  The Supreme Court granted *certiorari* to resolve the circuit split on the meaning of § 1348.  The Supreme Court held that § 1348 does not "attribute to a national bank, for diversity jurisdiction purposes, the citizenship of each State in which the bank has established operations."  546 U.S. at 313.   Against the backdrop of judicial parity, the Supreme Court reasoned that, if national banks were subject to diversity jurisdiction in each state in which they operate a branch, it would:

> severely constrict[] national banks' access to diversity jurisdiction as compared to the access available to corporations generally. For purposes of diversity, a corporation surely is not deemed a citizen of every State in which it maintains a business establishment. *See Pennsylvania R. Co. v. St. Louis, A. & T. H. R. Co*., 118 U.S. 290, 295-96, 6 S. Ct. 1094, 30 L. Ed. 83 (1886).  Rather, under 28 U.S.C. § 1332(c)(1), a corporation is "deemed to be a citizen" only of  "any State by which it has been incorporated" and "of the State where it has its principal place of business." Accordingly, while corporations ordinarily rank as citizens of at most 2 States, Wachovia, under the Court of Appeals' novel citizenship rule, would be a citizen of 16 States.

*Id.* at 317.

     Applying the reasoning of *Wachovia,* the court recognizes the backdrop of judicial parity and finds those principals applicable to its analysis.  The *Wachovia* Court reasoned that corporations are usually citizens of only two states, whereas, if Wachovia were to be considered a citizen in each state where it operated branches, Wachovia would be a citizen of 16 states, which the Court found to be an "anomalous result." 571 U.S. at 318.  The Court further noted that in comparison to corporations, national banks would be limited in accessing courts on a diversity jurisdiction basis.  Here, the logical extension of Plaintiffs' argument would subject Capital One to general personal jurisdiction in at least seven states.  Corporations are subject to general personal jurisdiction in their state(s) of incorporation and in which they maintain their principal place of business.  Courts have consistently held that corporations having physical locations and conducting business within a state is insufficient for general personal jurisdiction. *See Fidrych v. Marriott Int'l, Inc.,* 952 F.3d 124 (4th Cir. 2020), *supra*, (holding that South Carolina lacked general personal

made clear that only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Daimler,* 571 U.S. at 137 (citing *Goodyear,* 564 U.S. at 924). Accordingly, the court finds Capital One's contacts with Maryland insufficient to exercise general personal jurisdiction over Capital One. The 12(b)(2) Motion will be granted.

## II.   FAILURE TO STATE A CLAIM – 12(b)(6)[4]

Although the court finds that it lacks personal jurisdiction over Capital One, for purpose of completeness, the court will address Capital One's 12(b)(6) arguments. Capital One argues that, even if this court determines it can exercise personal jurisdiction, Plaintiff's Complaint must still be dismissed for failure to state a claim. (ECF No. 31-2, p. 9.)

### A.   **Statutory Preemption – Counts 6 and 7**

#### 1.   *UCC Article 4A*

Defendant argues that Plaintiffs' tortious aiding and abetting and unjust enrichment claims are preempted by Article 4A of the Maryland Uniform Commercial Code ("UCC"), which governs funds transfers. Specifically, according to Capital One, Article 4A preempts Plaintiffs' common

---

jurisdiction over Marriott – which is incorporated in Delaware with its principal place of business in Maryland – for an injury that occurred in Italy, despite Marriott having affiliated hotels and online booking access in the state); *Cohen v. Starbucks Corp.*, 2019 WL 2591164 *8-10 (D.N.J. Jun 25, 2019) (holding New Jersey lacked general personal jurisdiction over Starbucks despite the plaintiff's allegation that Starbucks operates "hundreds, if not thousands of retail outlets within the state." The court reasoned, "Plaintiff's position would render Starbucks 'at home' and subject to general jurisdiction in each state in which it has a large number of retail outlets. Starbucks has thousands of retail outlets throughout all fifty states. Its retail outlets in New Jersey are no more 'extensive' than its retail outlets in alternative/comparable states. These are unremarkable circumstances that do not elevate Starbucks to 'at-home' status in New Jersey. Therefore, this is not a circumstance that is 'exceptional' where Starbucks' affiliations with this forum are so 'continuous and systematic' as to render it essentially at home in New Jersey.") To ensure judicial parity, as set forth in *Wachovia*, this court's holding must be consistent with the holdings in cases dealing with corporations. Capital One cannot be subject to general personal jurisdiction in multiple states where it conducts business solely by virtue of being a national bank. Accordingly, Plaintiffs have not demonstrated the exceptional circumstances that would subject Capital One to general personal jurisdiction in the State of Maryland.

[4] The court notes that Plaintiffs and Capital One apply Maryland law in support of their arguments. The court recognizes that proper resolution of 12(b)(6) claims involves a choice of law analysis to determine which state's law is applicable to Plaintiffs' claims. That notwithstanding, neither party raises a choice of law argument. Given the court's ruling on the 12(b)(2) Motion, it addresses the 12(b)(6) Motion for purposes of completion only. Therefore, the court will address the arguments raised by the parties and declines to raise, *sua sponte,* and decide, the choice of law issue given the parties' uncontested election to employ Maryland law in support of their respective arguments.

law claims against Capital One as the beneficiary bank of a wire transfer with a misdescription of the account holding beneficiary. (ECF No. 31-2, pp. 9-15.)  Plaintiffs acknowledge that Article 4A would preempt an action against Capital One for acceptance of the wire transfer in question; Plaintiffs argue, however, that they have sued Capital One for its alleged role in the fraud – *i.e.,* enabling completion of the phishing scheme.  (ECF No. 33, p. 8.)

In instances where Maryland's UCC and the common law "both provide a means of recovery, the Code should displace the common law, because variations in the common law among states destroy the uniformity in commercial transactions sought to be accomplished by the [UCC]." *Equitable Life Assur. Soc. of the U.S. v. Okey*, 812 F.2d 906, 909 (4th Cir. 1987) (citing R. Hillman, *Construction of the Uniform Commercial Code: UCC Section 1-103 and "Code" Methodology*, 18 B.C. INDUS. & COMM. L. REV. 655, 662-63 (1977)).  *See also Mar-Chek, Inc. v. Mfrs. & Traders Co.*, 2019 U.S. Dist. LEXIS 116005 *18 (D. Md. Jul. 11, 2019) (holding that "[t]he UCC preempts common law claims when it provides an adequate alternative remedy").  Article 4A of the Maryland UCC provides in pertinent part:

> 'Funds transfer' means the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the originator's bank or by an intermediary bank intended to carry out the originator's payment order. A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order.

MD. CODE ANN., COM. LAW § 4A-104(1).  The drafters of the UCC "thoroughly considered" the competing interest involved in funds transfers, and the:

> . . . rules that emerged represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Title. Consequently, resort to principles of law or equity outside of Title

4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Title.

Official Comment to MD. CODE ANN., COM. LAW § 4A-102.  Generally, Article 4A covers claims involving funds transfers, thus preempting common law claims seeking recovery for alleged wrongs involving funds transfers. *Mar-Chek*, 2019 U.S. Dist. LEXIS 116005 at *18.

Plaintiffs allege:

> On or about May 5, 2020, Defendant Thomas opened account number xxxxxxx7060 ("Fraudulent Account") with Defendant Capital One using its online opening feature.

> On or about September 2, 2020, 2020, Defendants Thomas and/or Vanfica sent a phishing email to Plaintiffs providing mortgage payoff instructions specifically relating to a refinance transaction being conducted.

> On or About September 10, 2020, in response to the phishing email containing the fraudulent inducement from Defendant Thomas, Plaintiff Legends Title transferred $333,734.98 into the fraudulent account at Defendant Capital One's bank.

> The beneficiary identified on the wire instructions was Quicken Loans, LLC.

> On or about September 15, 2020, Plaintiffs reported the theft to their bank and to the Federal Bureau of Investigation by filing the required IC-3 forms.

> Defendant Thomas opened an account at a bank owned by Defendant Capital One into which Defendant Thomas fraudulently induced Plaintiffs to deposit money.

> Defendant Capital One had constructive knowledge of the fraudulent activity which exhibited classic signs of fraud (i.e., opening account with small amount, making small payments using account and continuing to fund with additional small deposits, followed shortly thereafter by a very large deposit, and the systematic withdrawal of large sums soon thereafter).

> Further, Defendant Capital One had actual knowledge of the fraud because Defendant Thomas told Defendant Capital One that the fraudulent transfer into his account was not his.

> Additionally, after notification by Defendant Thomas, Defendant Capital One could have reviewed the instructions provided by Plaintiffs showed the beneficiary of the deposit as Quicken Loans, LLC, not Defendant Thomas.

(ECF No. 28 ¶¶ 13, 16-18, 24, 74-77.)

Plaintiffs' allegations demonstrate that their claims against Capital One relate to Capital One's acceptance of the wire transfer and alleged failure to return the wire transfer funds to Plaintiff.   Although Plaintiffs allege that they identified the beneficiary as Quicken Loans, LLC by name, the account number belonged to Thomas.   Article 4A-207 of the Maryland UCC allows for a beneficiary bank such as Capital One to pay on the basis of the account number.   MD. CODE ANN., COM. LAW § 4A-207.

> Subsection (b), which takes precedence over subsection (a), deals with the problem of payment orders in which the description of the beneficiary does not allow identification of the beneficiary because the beneficiary is described by name and by an identifying number or an account number and the name and number refer to different persons.   . . .   Subsection (b) allows banks to utilize automated processing by allowing banks to act on the basis of the number without regard to the name if the bank does not know that the name and number refer to different persons. "Know" is defined in Section 1-201(25) to mean actual knowledge, and Section 1-201(27) states rules for determining when an organization has knowledge of information received by the organization.   The time of payment is the pertinent time at which knowledge or lack of knowledge must be determined.
>
> . . . Subsection (b)(1) deals with the typical case in which the beneficiary's bank pays on the basis of the account number and is not aware at the time of payment that the named beneficiary is not the holder of the account which was paid. In some cases the false number will be the result of error by the originator. In other cases fraud is involved. For example, Doe is the holder of shares in Mutual Fund.   Thief, impersonating Doe, requests redemption of the shares and directs Mutual Fund to wire the redemption proceeds to Doe's account #12345 in Beneficiary's Bank.   Mutual Fund originates a funds transfer by issuing a payment order to Originator's Bank to make the payment to Doe's account #12345 in Beneficiary's Bank. Originator's Bank executes the order by issuing a conforming

> payment order to Beneficiary's Bank which makes payment to account #12345. That account is the account of Roe rather than Doe. The case law is unclear on the responsibility of a beneficiary's bank in carrying out a payment order in which the identification of the beneficiary by name and number is conflicting. . . . Section 4A-207 resolves the issue.
>
> . . . If Beneficiary's Bank did not know about the conflict between the name and number, subsection (b)(1) applies. Beneficiary's Bank has no duty to determine whether there is a conflict and it may rely on the number as the proper identification of the beneficiary of the order. When it accepts the order, it is entitled to payment from Originator's Bank. Section 4A-402(b).

Official Comment No. 2 of MD. CODE ANN., COM. LAW § 4A-207.

Under subsection (c) of 4A-207:

> . . . the originator is responsible for the inconsistent description of the beneficiary if it had notice that the order might be paid by the beneficiary's bank on the basis of the number. If the originator is a bank, the originator always has that responsibility. The rationale is that any bank should know how payment orders are processed and paid. If the originator is not a bank, the originator's bank must prove that its customer, the originator, had notice. Notice can be proved by any admissible evidence.

Official Comment No. 3 of MD. CODE ANN., COM. LAW § 4A-207.

With respect to remedies, § 4A-207(d) provides in pertinent part:

> (d) In a case governed by subsection (b)(1), if the beneficiary's bank rightfully pays the person identified by number and that person was not entitled to receive payment from the originator, the amount paid may be recovered from that person to the extent allowed by the law governing mistake and restitution as follows:
>
>> (1) If the originator is obliged to pay its payment order as stated in subsection (c), the originator has the right to recover.
>>
>> (2) If the originator is not a bank and is not obliged to pay its payment order, the originator's bank has the right to recover.

Here, Capital One, as the beneficiary bank, paid Thomas, who was identified by account number.  Although the beneficiary listed by name was Quicken Loans, LLC, Plaintiffs do not allege that Capital One had knowledge of the conflict at the time it made payment to Thomas. Indeed, Plaintiffs allege that Capital One did not have actual knowledge of the conflict until after payment was made when Thomas allegedly notified Capital One of the mistake and Plaintiffs' bank informed Capital One through an online bank messaging system.  Capital One was entitled to rely upon the account number in issuing payment and any remedies flowing from a conflict between the beneficiary's name and account number are set forth in Section 4A-207(d). Accordingly, Plaintiffs claims against Capital One are preempted by Article 4A of the Maryland UCC.

### 2. *Maryland Adverse Claims Statute*

Capital one further argues that Plaintiffs' claim that Capital One should be held liable for not returning to them the funds in question conflicts with the Maryland Adverse Claims Statute. (ECF No. 31-2, p. 15.)  Plaintiffs counter that, because Capital One was made aware that the funds were not intended for Thomas, it lost any immunity granted pursuant to the Adverse Claims Statute and subjects itself to pecuniary damages.  (ECF No. 33, p. 10) (citing *McHugh & Assocs. V. Commercial & Farmers Bank,* 59 Md. App. 519, 520 (1984)).

Maryland's Adverse Claim Statute provides:

> (a) Except as provided in subsection (b) of this section, a banking institution is not required to recognize or take any action on any claim to a deposit or to money or property held by it or contained in a safe-deposit box, if that claim is adverse to the interests of any person who, on its records, appears to be entitled to the deposit, money, or property.

> (b) If, in an action to which the adverse claimant is a party, a court order or decree involving a claim to the deposit, money, or property is served on the banking institution, the banking institution may or,

> if required by the court, shall impound the deposit, money, or property, subject to further order of the court, without any liability on its part to anyone for doing so.

MD. FIN. INST. CODE ANN., § 5-306.

Here, contrary to Plaintiffs' assertion, *McHugh* and the cases it relies upon are distinguishable from the case before this court. In *McHugh*, the appellant was one partner in a partnership. 59 Md. App. at 521. The partnership opened an account with the appellee bank in the name of the partnership. *Id.* The appellee bank impounded the funds in the account pursuant to a writ based on a judgment against one of the partners. Guided by the holdings in *Fairfax, infra* and *Andree, infra,* the *McHugh* court determined that the bank should not have impounded the money when it knew the account belonged to the partnership, and not the individual partner. The court in *McHugh* held, "We conclude that by its actions in this case appellee violated the holding in *Fairfax* as explicated by *Andree* and lost the protection afforded by [MD. FIN. INST. CODE ANN.], § 5-306, subjecting itself to possible pecuniary damages in favor of the appellant." *Id.* at 527.

In *Fairfax v. Savings Bank of Baltimore*, 175 Md. 136 (1938), a husband and wife were joint owners with survivorship rights of a bank account. *Id.* at 138-39. A creditor filed writs for an attachment issued on a judgment against the husband. The wife filed motions to quash the writs. *Id.* In affirming the lower court's judgment granting the motions to quash, the *Fairfax* court reasoned and held:

> It is apparent that if the husband had died after the attachment was issued, the judgment creditor would have no right against the funds or corpus, and the wife would receive, use, and enjoy her absolute estate in severalty in all of the personalty. The attaching creditor could not compel the husband as beneficiary to deprive the other cestui que trust of the benefit of her right of survivorship by a present appropriation of the whole or any part of the trust fund so held for their benefit. A valid trust may not be diverted from its uses by attachment.

21

*Id.* at 142.

In *Andree v. Equitable Trust Co.,* 46 Md. App. 688 (1980), a husband and wife shared a joint account.  The creditor had a judgment against only the wife but filed a writ of attachment on the joint account.  *Id.* at 690.  Relying on the holding in *Fairfax*, the *Andree* court held that, "[w]hen [the bank] froze the jointly held trust form accounts of [the husband and wife], they violated the holding of *Fairfax*, exceeded the protection afforded them by Md. Ann. Code art. 11, § 103, and subjected themselves to possible pecuniary damages to the [husband and wife]."  *Id. at* 694.  The *Andree* court explained that the writ commanded the garnishee to freeze and confer assets of accounts that are legally attachable, and "[i]mpounding accounts not legally attachable subjects the garnishee to suit by the improperly garnisheed depositor."  *Id.* at 693.

In each of the cases discussed above, a creditor of one account holder attached jointly held accounts. These facts are notably absent from the present case.  Here, there is no joint bank account and Capital One did not impound any account that was not "legally attachable."   Instead, Capital One froze Thomas' account until it could determine the proper owner of the funds at issue.  The holdings in *McHugh, Fairfax,* and *Andree* do not deprive Capital One of the protections set forth in Section 5-603.

### B.     Aiding and Abetting Fraud – Count 6

Capital One argues that Count 6 should be dismissed because Plaintiffs do not plead facts to support a claim for aiding and abetting fraud, especially in light of the heightened pleading standard under Rule 9(b).  (ECF No. 31-2, p.17).   The court notes that, although Capital One mentions the heightened pleading requirement of Rule 9(b), substantively, Capital One argues Plaintiffs cannot satisfy the elements of aiding and abetting because Capital One owed no duty to them.

Under Rule 9(b), claims that sound in fraud must generally be plead with particularity, specifying "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [they] obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783-84 (4th Cir. 1999); FED R. CIV. P. 9(b).

Under Maryland law, to state a claim for aiding and abetting, Plaintiffs must allege: the existence of "underlying tortious activity;" *Alleco Inc. v. Harry & Jeanette Weinberg Found.*, 340 Md. 176, 201 (1995), and that "the aider and abettor 'knowingly and substantially assist[ed] the principal violation.'" *Sutton v. FedFirst Fin. Corp.*, 226 Md. App. 46, 91 (2015) (quoting *Holmes v. Young,* 885 P.2d 305, 308 (Colo Ct. App. 1994)).

### 1.    *Underlying tortious activity*

With respect to the underlying tortious activity, Plaintiffs allege:

> Defendant Thomas and Defendant Vanfica knowingly asserted false representations of material fact with the intention of inducing induced Plaintiffs to deposit amounts totaling $333,734.98 to an account held with Defendant Capital One.
>
> Defendant Thomas and Defendant Vanfica, in fact, did induce Plaintiffs to deposit said amounts to an account held with Defendant Capital One.
>
> Defendant Thomas opened an account at a bank owned by Defendant Capital One into which Defendant Thomas fraudulently induced Plaintiffs to deposit money.

(ECF No. 28, ¶¶ 72-74.)

Capital One does not advance any arguments countering Plaintiffs' allegations regarding the underlying tortious activity by Thomas and Vanfica.  Taking Plaintiffs allegations as true for the purposes of the 12(b)(6) Motion, the court is satisfied that Plaintiffs adequately allege the first prong of an aiding and abetting claim.

23

###### 2.    *Knowledge*

Capital One argues that no relationship existed between Plaintiffs and Capital One, and, therefore, Capital One owed Plaintiffs no duty as non-customers.  (ECF No. 31-2, p. 19.)

"[A]n evaluation of the 'knowledge' requirement of the aiding and abetting liability test turns upon whether the aider and abettor defendant owed a duty to the plaintiff.  When there is no duty running from the alleged aider and abettor to the plaintiff, the defendant must possess a 'high conscious intent' and a 'conscious and specific motivation' to aid the fraud."  *Schatz v. Rosenberg,* 943 F.2d 485, 496 (4th Cir. 1991) (citations omitted).  "Absent a duty to disclose, allegations that a defendant knew of the wrongdoing and did not act fail to state an aiding and abetting claim."  *Id.* (citing *In re Gas Reclamation, Inc. Sec. Lit*., 659 F. Supp. 493 (S.D.N.Y. 1987) (holding that allegations that defendant accounting firm knew of alleged fraud and failed to disclose it or otherwise stop scheme failed to state an aiding-abetting claim)).

With respect to the second prong, Plaintiffs allege:

> Defendant Capital One had constructive knowledge of the fraudulent activity which exhibited classic signs of fraud (i.e., opening account with small amount, making small payments using account and continuing to fund with additional small deposits, followed shortly thereafter by a very large deposit, and the systematic withdrawal of large sums soon thereafter).
>
> Further, Defendant Capital One had actual knowledge of the fraud because Defendant Thomas told Defendant Capital One that the fraudulent transfer into his account was not his.

(ECF No. 28, ¶¶ 75-76.)

With respect to the relationship between Plaintiffs and Capital One, and any duty Capital One owed Plaintiffs, the Complaint alleges:

> Plaintiff Legends Title is an accountholder of Defendant Capital One with a "SparkBusiness" Visa credit card.
>
> Defendant Capital One failed to notify Plaintiffs that it had communicated with the fraudster.
>
> Defendant Capital One had a duty to return the fraudulently obtained funds immediately upon notification by Defendant Thomas but, instead, retained the Plaintiffs' funds.
>
> Defendant Capital One had a duty to return the fraudulently obtained funds immediately upon subsequent notification by the Bank of Utah but, again, retained the Plaintiffs' funds.
>
> By knowingly retaining the Plaintiffs' funds, Defendant Capital One created a banking relationship, an intimate nexus, between the Plaintiffs and Defendant Capital One extending beyond the customer-vendor relationship already in existence.

(ECF No. 28, ¶¶ 11, 38-41.)

Although Plaintiffs allege that that Capital One had actual and constructive knowledge of the fraud, and a duty to return the funds in Thomas' account, Plaintiffs do not allege that Capital One had any duty to disclose.  Therefore, absent the duty to disclose, Capital One's alleged failure to return the money is insufficient to state a claim for aiding and abetting.  Further Plaintiffs allegations, if true, do not demonstrate that Capital One had a "high conscious intent" or "conscious and specific motivation" to aid the fraud.  *Schatz,* 943 F.2d at 496 (citations omitted). Plaintiffs' allegations regarding Capital One's alleged wrongdoing occur after completion of the alleged fraud.  Further, Capital One worked with Plaintiffs to return a portion of the funds at issue. *See* (ECF No. 28, ¶ 30) ("On or about July 1, 2021, Defendant Capital One issued a check to Plaintiffs in the amount of $185,854.22.")  Plaintiffs' allegations regarding Capital One's failure to return the money, absent a court decree[5] after completion of the alleged fraud, do not arise to

---

[5] See the court's discussion at II. A. 2.

high conscious intent of specific motivation to aid Thomas and Vanfica in the alleged fraud. Accordingly, Plaintiffs allegations do not state a claim for aiding and abetting as they fail under prong two of the analysis.

### 3.    Substantial Assistance

With respect to substantial assistance, Plaintiffs allege:

> Additionally, after notification by Defendant Thomas, Defendant Capital One could have reviewed the instructions provided by Plaintiffs showed the beneficiary of the deposit as Quicken Loans, LLC, not Defendant Thomas.

> Defendant Capital One aided and abetted the wrongful and tortious conduct of Defendants Thomas and Vanfica and knowingly provided substantial assistance, aid, and encouragement in the commission of such conduct by failing to act swiftly upon notification of the fraud.

(ECF No. 28, ¶¶ 77-78.)

As explained earlier, Capital One owed Plaintiffs no duty to disclose. Accordingly, its failure to disclose the alleged fraud after receiving notification from Thomas and Plaintiffs' bank cannot serve as the basis for substantial assistance. *See Schatz,* 943 F.2d at 497 ("We have already held that [the defendants] owed no duty to disclose Rosenberg's misrepresentations to the [plaintiffs]; thus, [the defendants] cannot be held liable as aiders and abettors for failing to disclose this information.")

### B.    <u>Unjust Enrichment against Capital One (Count 7)</u>

Capital One argues that Plaintiffs' allegations fail to satisfy the first and third elements of unjust enrichment. (ECF No. 31-2, pp. 20-22.)

Under Maryland law, to state a claim for unjust enrichment, Plaintiffs must plead: (1) [a] benefit conferred upon the defendant by the plaintiff; (2) [a]n appreciation or knowledge by the defendant of the benefit; and (3) [t]he acceptance or retention by the defendant of the benefit under

such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Sterrett v. Dore,* 2016 Md. App. LEXIS 236, *7 (Nov. 14, 2016) (quoting *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295 (D. Md. 2007) (citations omitted)).

Turning to the first element of unjust enrichment, Plaintiffs allege:

> Plaintiffs' funds were deposited into Defendant Thomas' account at a branch owned by Defendant Capital One.
>
> As a direct and proximate result of the intentional misrepresentation of Defendants Thomas and Vanfica and the tortious aiding and abetting of Defendant Capital One, Plaintiffs conferred a benefit on Defendant Capital One by depositing $333,734.98 to an account held with Defendant Capital One's institution
>
> Despite the refund of a portion of the funds by Defendant Capital One to Plaintiffs, Defendant Capital One had access to and used the funds in its daily business banking activities including, but not limited to, using the funds to support overnight deposits and interest earnings, solidifying its capital reserve requirements with the U.S. Federal banking system, and to make money for its shareholders.

(ECF No. 28, ¶¶ 81-82, 88.)

As discussed *infra* at Section II. A. 1., the benefit of the alleged fraudulent wire transfer attached to Thomas as the account owner, not Capital One as the beneficiary bank.  Accordingly, Plaintiffs have failed to allege that they conferred a benefit upon Capital One because the funds benefitted Thomas, the account holder.  *See Nat'l Union Fire Ins. v. Bank of Amer., N.A.,* 240 F. Supp. 2d 455, 457(D. Md. 2003) (holding that "[n]o action lies against the defendant, as a matter of Maryland law, for money had and received under these facts.  Whether or not the defendant was negligent in allowing money to be deposited into the Bobby Stevens Account, and/or later to be wire transferred, it retains not a penny of the money.  Restitutionary remedies are inappropriate in such a circumstance.  . . .  Because the Bank of America retains none of the proceeds of the

particular check at issue in Count 1, or of the Venus Baldwin account referenced above, there can

be no action under Maryland law for money had and received. . . . ")[6]

With respect to the appreciation or knowledge of the alleged benefit, Plaintiffs allege:

> Upon receipt of the fraudulent transfer into his account, Defendant Thomas notified Defendant Capital One that the funds were not his.

> Thereafter, Plaintiffs' bank, Bank of Utah, notified Defendant Capital One of the fraudulent transfer into the account.

> Defendant Capital One had actual notice of the benefit conferred on Defendant Capital One by the Plaintiff.

> Defendant Capital One not only knowingly allowed the tortious activities to occur but failed to timely reimburse Plaintiffs despite the fact that money remained in the account.

(ECF No. 28, ¶¶ 83-85, 88.) Capital One does not advance any facts or arguments to dispute that

it was aware of the benefit; however, Capital One's purported knowledge of any "benefit" alone

will not support a claim for unjust enrichment.

Finally, with respect to whether Capital One accepted or retained the alleged "benefit" such

that it would be inequitable for Capital One to retain the benefit, Plaintiffs allege:

> Despite the numerous notifications by Defendant Thomas, Bank of Utah, and the Plaintiffs' attorney, Defendant Capital One unlawfully retained possession the Plaintiffs' funds, having to be coerced into finally releasing them on July 1, 2021 – more than 9.5 months after being notified of the fraud.

> Defendant Capital One's acceptance and retention of the deposit from Plaintiffs totaling $333,734.98, as a direct and proximate result

---

[6] Jude Smalkin's decision in this case was vacated on July 15, 2003, because the plaintiff requested the vacatur; Judge Smalkin did not vacate his decision because he had changed his conclusions. As the court in *Nat'l Fire Ins. Co. v. Allfirst Bank,* 282 F. Supp. 2d 339, 351, explained, and this court agrees:

> Of course, no decision of a district court judge is technically binding on another district court judge, even within the same district. *See Bryant v. Smith* 165 B.R. 176, 180-81 (W.D. Va. 1994). Opinions of other district judges are, however, "persuasive authority entitled to substantial deference," *id*., but this remains true whether or not "repeat players' are successful in their attempts to have adverse rulings vacated. The undersigned hereby adopts Judge Smalkin's conclusion, not because it is binding, but because it is compelling.

of its tortious aiding and abetting of the conduct of Defendants Thomas and Vanfica, makes it inequitable for Defendant Capital One to retain those funds.

Despite the refund of a portion of the funds by Defendant Capital One to Plaintiffs, Defendant Capital One had access to and used the funds in its daily business banking activities including, but not limited to, using the funds to support overnight deposits and interest earnings, solidifying its capital reserve requirements with the U.S. Federal banking system, and to make money for its shareholders.

(ECF No. 28, ¶¶ 29-30, 87-88.)

As the court has explained, under Maryland UCC § 4A-404(a), wire transfer funds belong to the beneficiary, not the bank. Accordingly, the alleged benefit belongs to Thomas as the account holder and designated beneficiary on the payment order, not Capital One. Further, to the extent Capital One has not released some portion of the funds to Plaintiffs, its retention of the transfer funds does not create the "inequitable circumstances" essential for an unjust enrichment claim. As the court discussed in Section II. A. 2, Capital One is entitled to protect itself from potential litigation by not releasing disputed funds absent a court order or decree. Therefore, Capital One's alleged failure to disperse the remaining funds in Thomas' account to Plaintiffs is insufficient to support a claim for unjust enrichment.

## CONCLUSION

For the reasons set forth herein, the Capital One Motion (ECF No. 31) is **GRANTED** with respect to Counts 6 and 7. This case shall proceed as to Plaintiffs' claims against Darrel Mark Thomas and Vanfica 07 Inc. (Counts 1 through 5).

A separate order follows.

_____/s/_____

Julie R. Rubin
United States District Judge